UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

IRENE DA COSTA,

                           Plaintiff,

            - against -

MARTIN J. O'MALLEY, Commissioner of the
Social Security Administration,

                     Defendant.
-----------------------------------------------------------------X

23-CV-6396-RWL

**DECISION AND ORDER**

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

Plaintiff Irene Da Costa, represented by counsel, commenced this action against Defendant Commissioner of the Social Security Administration (the "Commissioner") pursuant to the Social Security Act, (the "Act"), 42 U.S.C. 405(g), seeking review of the Commissioner's decision that Ms. Da Costa was not married to Mr. David Ruth under Pennsylvania's common law, and therefore not entitled to widow's benefits.[1]  Plaintiff moves for judgment on the pleadings.  For the reasons set forth below, Plaintiff's motion is DENIED.

## Factual Background

Ms. Da Costa met Mr. Ruth in 1984. (R. 29.[2])  Upon meeting, they decided to live together as "husband and wife" in Miami, Florida, and exchanged private vows of commitment.  (*Id.* 29 – 30, 35, 196.)  Ms. Da Costa testified that she and Mr. Ruth "…said

---

[1] The action as filed named then-Commissioner Kilolo Kijakazi.  Martin J. O' Malley was sworn in as Commissioner on December 20, 2023.

[2] "R" refers to the Certified Administrative Record (the "Record") at Dkt. 14.

[they] would live together as husband and wife even, even though [they] didn't do, you know, the ceremony." (*Id.* 29.)  Ms. Da Costa further testified that "in [their] hearts, [they], were married to each other." (*Id.* 113.)  While cohabiting in Florida and New York, they introduced themselves as a "married couple" at church and social events. (*Id.* 111.)  Mr. Ruth's father, Smedley B. Ruth, and brother, Scott Ruth, referred to Ms. Da Costa as "[Mr. Ruth's] wife," and his nieces and nephews called her "Aunt Irene." (*Id.* at 36-37, 185, 202.)  In 1992, Ms. Da Costa and Mr. Ruth moved to New York City, where they lived together in a leased apartment. (*Id.* 194.)  The lease application listed Ms. Da Costa as a member of Mr. Ruth's "immediate family" and his "fiancée." (*Id.* 196.)  The couple separated in 1993, reconciled in 1996, and resumed living together. (*Id.* 110.)  In 1999, Ms. Da Costa and Mr. Ruth traveled to New Orleans, Louisiana, to renew their private marital vows. (*Id.* 117, 198.)

Ms. Da Costa and Mr. Ruth jointly owned a car and corresponding insurance policy. (*Id.* 30.)  In addition, Ms. Da Costa was identified as Mr. Ruth's life insurance beneficiary. (*Id.*)  However, they maintained separate bank accounts, health insurance, and tax returns. (*Id.* 30-31.)  In 2002, Mr. Ruth referred to Ms. Da Costa as his "fiancée" when contesting a credit card bill payment on their joint VISA account. (*Id.* 30,195.)

In 2004, Mr. Ruth was diagnosed with terminal brain cancer. (*Id.* 113.)  On March 22, 2005, Ms. Da Costa and Mr. Ruth had a ceremonial marriage, and were undisputedly legally married under the state laws of New York. (*Id.* 170.)  As a result of their legally-recognized ceremonial marriage, Ms. Da Costa was permitted to make medical and legal decisions on behalf of Mr. Ruth. (*Id.* 41,113, 166.)  After their ceremonial marriage, Ms. Da Costa joined Mr. Ruth's health insurance policy, combined their bank accounts, and

filed joint tax returns.  (*Id*. 31-32.)  Mr. Ruth passed away on August 16, 2005, five months after their ceremonial marriage.  (*Id.* 108.)

Although domiciled in Florida and New York during their relationship (*id.* 33-34), Ms. Da Costa and Mr. Ruth traveled to Springfield, Pennsylvania to visit Mr. Ruth's family over Thanksgiving, Christmas, and family events during the 1980s to 2000s (*id.* 37, 200-01).  They typically shared a room at Smedley's house during their trips to Pennsylvania. (*Id*. 35-36, 200-01.)  According to Smedley, while visiting Pennsylvania, Ms. Da Costa was introduced to neighbors and shopkeepers as Mr. Ruth's "wife," and Smedley's "daughter-in-law."  (*Id*. 34, 202.)

### Procedural Background

Ms. Da Costa applied for widow's benefits on June 9, 2015, alleging eligibility as a widow of Mr. Ruth.  (*Id.* 172.)  After the Social Security Administration ("SSA") denied her claim, Ms. Da Costa requested a hearing before an administrative law judge ("ALJ"), which was held on January 29, 2018.  (*Id*. 48-49.)  On March 12, 2018, ALJ Vecchio found that Ms. Da Costa was not entitled to widow's benefits because her ceremonial marriage to Mr. Ruth did not satisfy the SSA's requirement that individuals be married for nine months before being eligible to collect widow's benefits.  (*Id*. 4-11, 55-57.)  Ms. Da Costa appealed ALJ Vecchio's decision to the Appeals Council.  (*Id*. 55-57.)  On March 19, 2019, the Appeals Council denied her appeal.  (*Id*.)

Ms. Da Costa then filed a civil action challenging the Commissioner's final determination that she was not entitled to widow's benefits.  (*Id*. 70-75.)  On January 16, 2020, the Commissioner and Ms. Da Costa stipulated to a remand of Ms. Da Costa's claims for additional proceedings.  (*Id*. 58.)  On remand, a different ALJ, ALJ Suarez,

considered whether Ms. Da Costa and Mr. Ruth had established a common law marriage during their relationship, and, if so, whether it existed for at least nine-months prior to Mr. Ruth's death.  (*Id*. 6, 73.)  Ms. Da Costa testified at a hearing before ALJ Suarez on October 13, 2022.  (*Id*. 154.)  On March 9, 2023, ALJ Suarez issued an order finding no common law marriage existed between the parties, denying Ms. Da Costa's claim.  (*Id*. 11, 154.)  On April 13, 2023, Ms. Da Costa appealed the ALJ's decision to the Appeals Council; however, the Appeals Council denied jurisdiction, thereby making ALJ's Suarez's decision to the Commissioner a final determination.  (*Id*. 15, 167.)

Ms. Da Costa filed the instant action seeking review on July 24, 2023.  (Dkt. 1.) The parties consented to my jurisdiction for all purposes.  (Dkt. 12.)  Ms. Da Costa's motion for judgment on the pleadings was fully briefed as of June 17, 2024.  (Dkt. 22.)

## Standard Of Review

The court's review of the Commissioner's denial of widow's benefits requires two levels of inquiry.  *Johnson v. Bowen*, 817 F.2d 983, 985 (2d Cir. 1987).  First, the court determines whether the Commissioner applied the correct legal principles in reaching their decision.  42 U.S.C. § 405(g); *see also Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999).  Second, the court decides whether the Commissioner's decision is supported by substantial evidence in the record.  *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999). So long as they are supported by substantial evidence in the administrative record, the findings of the ALJ after a hearing as to any facts are conclusive.  42 U.S.C. § 405(g); *see also Brault v. Social Security Administration, Commissioner*, 683 F.3d 443, 447 (2d Cir. 2012) (*per curiam*).

4

A United States District Court may affirm, modify, or reverse (with or without remand) a final decision of the Commissioner.  42 U.S.C. § 405(g); *see also Skrodzki v. Commissioner of Social Security Administration*, 693 F. App'x 29, 29 (2d Cir. 2017) (summary order).  The inquiry is "whether the correct legal standards were applied and whether substantial evidence supports the decision."  *Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004), amended on reh'g in part, 416 F.3d 101 (2d Cir. 2005*); see also Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (same).

"'Failure to apply the correct legal standard constitutes reversible error, including, in certain circumstances, failure to adhere to the applicable regulations.'"  *Douglass v. Astrue*, 496 F. App'x 154, 156 (2d Cir. 2012) (quoting *Kohler v. Astrue*, 546 F.3d 260, 265 4 (2d Cir. 2008) (*per curiam*) (remanding for noncompliance with regulations)).  Courts review de novo whether the correct legal principles were applied and whether the legal conclusions made by the ALJ were based on those principles.  *See Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987) (remanding where the court could not "ascertain whether [the ALJ] applied the correct legal principles … in assessing [plaintiff's] eligibility for disability benefits"); *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (reversing where the Commissioner's decision "was not in conformity with the regulations promulgated under the Social Security Act"); *Thomas v. Astrue*, 674 F. Supp.2d 507, 515, 520 (S.D.N.Y. 2009) (reversing for legal error after de novo consideration).

If the reviewing court is satisfied that the ALJ applied the correct legal standards, then the court must "'conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision.'"  *Brault*, 683 F.3d at 447 (quoting *Moran v. Astrue*, 569 F.3d

108, 112 (2d Cir. 2009)).  Substantial evidence is defined as "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998) (quoting *Richardson*, 402 U.S.at 401); *see also Biestek v. Berryhill*, 587 U.S. 97, 104-05 (2019) (reaffirming same standard).  "The substantial evidence standard means once an ALJ finds facts, [the court] can reject those facts only if a reasonable factfinder would have to conclude otherwise."  *Brault*, 683 F.3d at 448 (internal quotation marks omitted) (emphasis omitted); *see also* 42 U.S.C. § 405(g) ("findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive").

Where evidence is deemed susceptible to more than one rational interpretation, the Commissioner's conclusion must be upheld.  42 U.S.C.A. § 405(g). The court must afford the Commissioner's determination considerable deference and "may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review."  *Jones v. Sullivan*, 949 F.2d 57, 59 (2d Cir. 1991) (quoting *Valente v. Secretary Of Health And Human Services*, 733 F.2d 1037, 1041 (2d Cir. 1984))*; Dunston v. Commissioner of Social Security*, No. 14-CV-3859, 2015 WL 54169, at *4 (S.D.N.Y. Jan. 5, 2015) (same) (internal citations omitted), *R. & R. adopted*, 2015 WL 1514837 (S.D.N.Y. Apr. 2, 2015).  Accordingly, if a court finds that there is substantial evidence supporting the Commissioner's decision, the court must uphold the decision, even if there is also substantial evidence for the claimant's position.  *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).  The court, however, will not defer to the Commissioner's determination if it is "the product of legal error."  *Dunston*, 2015 WL 54169, at *4 (internal quotation marks omitted).

**Legal Principles For Determining Marital Status**

A widow may be entitled to claim insurance benefits on behalf of a deceased and insured wage earner if the widow and the decedent were married for a minimum of nine months prior to the decedent's death.[3]  42 U.S.C. § 402(e)(1), (f)(1).  When evaluating whether the claimant and decedent were married, the SSA looks to the law of the state where the decedent was domiciled at time of death.  *Renshaw v. Heckler*, 787 F.2d 50, 52 (2d Cir. 1986).  Since Ms. Da Costa and Mr. Ruth were domiciled in New York at the time of Mr. Ruth's death, New York law governs their legal marital status.  New York state does not grant common law marriages, but pursuant to the Full Faith and Credit Clause, New York recognizes common law marriage if valid in the state where it was formed.  *See id.* (citing *Mott v. Duncan Petroleum Transportation*, 51 N.Y.2d 289, 292, 414 N.E.2d 657, 658 (1980)).

The parties do not dispute that Ms. Da Costa and Mr. Ruth were not legally married at least nine months before Mr. Ruth's death.  As noted above, they had a ceremonial marriage on March 22, 2005, and Mr. Ruth died less than five months later on August 16, 2005.  The issue before ALJ Suarez and under review here is whether, at least nine months before Mr. Ruth's death, Ms. Da Costa and Mr. Ruth had a common law marriage based on Pennsylvania law, which New York would then recognize as valid.

Pennsylvania law recognizes common law marriages created on or before January 1, 2005.  *Elk Mountain Ski Resort, Inc. v. Workers' Compensation Appeal Board*, 114

---

[3] An unmarried widow may also be found eligible for benefits under circumstances not relevant here.  *See* 42 U.S.C. § 402(e)(1), (f)(1); 20 C.F.R. § 335(b)–(e).

A.3d 27, 32 (Pa. Commw. Ct. 2015); *accord* POMS GN § 00305.075.[4]  A party claiming common law marriage under Pennsylvania law bears "a heavy burden" of proof due to concern for "perjury and fraud."  *Estate of Gavula*, 490 Pa. 535, 540, 417 A.2d 168, 171 (Pa. 1980) (citing *In re Wagner's Estate*, 398 Pa. 531, 532, 159 A.2d 495, 497 (Pa. 1960)).  "This is especially so where one of the parties is dead."  *Estate of Gavula*, 417 A.2d at 171.  There are two ways in which a common law marriage may be formed: one being by express agreement, the other by "constant cohabitation and reputation of marriage."  *Elk Mountain Ski Resort, Inc.*, 115 A.3d at 33.

### 1. Express Agreement

Two individuals form an express agreement ("*verba in praesenti*") of marriage when they exchange "words in the present tense, spoken with the specific purpose that the legal relationship of husband and wife is created …."  *Staudenmayer v. Staudenmayer*, 552 Pa. 253, 261-62, 714 A.2d 1016, 1020-21 (Pa. 1998).  The moving party seeking recognition of a common law marriage carries the burden of proving with clear and convincing evidence that an express agreement was made.  *Id.*; *Hartenstine v. Bullock*, No. 250 E.D.A. 2015, 2016 WL 3135788, at *1, 9-10 (Pa. Super. Ct. June 3, 2016).  The express agreement must consist of an exchange of words between the two individuals seeking to create a common law marriage and must be uttered in a state that recognizes common law marriage.  *Hartenstine,* 2016 WL 3135788, at *10 (citing *Jewett*

---

[4] Program Operations Manual System ("POMS") consists of guidelines set forth by the SSA to recommend how courts and ALJs should interpret the Social Security Commissioner's decisions.  *Sassower v. Berryhill*, 2018 WL 7968910, * 4 n.5 (S.D.N.Y. Dec. 13, 2018).  POMS guidelines are not binding authority and do not have the force of law.  *Tejada v. Apfel,* 167 F.3d 770, 775 (2d Cir. 1999).

*v. Jewett*, 196 Pa. Super. 305, 306, 175 A.2d 141, 142 (Pa. Super. Ct. 1961) (holding that law of the state where couple creates express agreement to be married governs).

Although the agreement must be express, there are no specific words required. *Staudenmayer*, 714 A.2d at 1020-21.  Instead, there only needs to be proof that the parties intended to create a binding legal marriage among themselves at the time of utterance.  *Hartenstine*, 2016 WL 3135788, at *9.  The present utterances do not need to be made in the state in which the claimant and deceased were domiciled.  *Renshaw*, 787 F.2d at 52.  Rather, the express agreement can be made while traveling through a state which recognizes common law marriage.  *Id.*

### 2.    Continuous Cohabitation and Reputation of Marriage

In the absence of clear and convincing evidence of an express agreement, a common law marriage can still be found based on evidence of both (1) continuous cohabitation and (2) a general and broad reputation of marriage.  *In re Manfredi's Estate*, 399 Pa. 285, 291, 159 A.2d 697, 700 (Pa. 1960).  When the parties cannot attest to the existence of express agreement, a rebuttable presumption of marriage arises if there is "sufficient proof" of continuous cohabitation and a broad and general reputation of marriage.  *Staudenmayer*, 714 A.2d at 1021; *In re Cummings Estate*, 330 Pa. Super. 255, 263-64, 479 A.2d 537, 542 (Pa. 1984).  Continuous cohabitation requires that a couple lives together "constant[ly], as distinguished from an irregular or inconstant" living arrangement.  *Manfredi's Estate*, 159 A.2d at 700.

Reputation of marriage must be broad and general, not "partial or divided."  *Id.*  A reputation of marriage can be supported by financial and legal documents with consistent representations of marital status.  *Renshaw*, 787 F.2d at 51 (applying Pennsylvania law

9

and finding a reputation of marriage due to the couple filing joint tax returns, the wife adopting her husband's last name, and the wife being listed as a life insurance beneficiary).  The proof of reputation "must be general and not confined to a few persons in the immediate neighborhood, as the relationship may be established for the purpose of deceiving others."  *Sturgill v. Boilermarker-Blacksmith National Pension Trust*, No. 19-CV-00925, 2021 WL 5909207, at *1, 6 (M.D. Pa. Sept. 10, 2021), *R. & R. adopted*, 2021 WL 5904949 (M.D. Pa. Sept. 10, 2021) (quoting *Manfredi's Estate*, 159 A.2d at 700).  No presumption of common law marriage will be found if there is evidence of continuous cohabitation, but only partial or divided reputation of marriage.  *Renshaw*, 787 F.2d at 51.  Nor will the presumption apply if there is proof of general and broad reputation of marriage, but insufficient proof of continuous cohabitation.  *Manfredi's Estate*, 159 A.2d at 700.

### Discussion

ALJ Suarez found that Ms. Da Costa did not demonstrate that she and Mr. Ruth enjoyed common law marriage status under either prong of Pennsylvania's requirements.  The ALJ's ruling in both respects is supported by substantial evidence.

### A.     Substantial Evidence Supports The ALJ's Finding No Express Agreement

ALJ Suarez found that the existence of a common law marriage failed on the first prong, as there was insufficient evidence of an express agreement between Ms. Da Costa and Mr. Ruth being made in a state which recognizes common law marriages.  (R. at 9.)  More particularly, the record did not contain clear and convincing evidence that Da Costa and Mr. Ruth exchanged utterances intending to be married in the present tense while in the state of Pennsylvania.  (*Id.*)  Ms. Da Costa did testify that she and Mr. Ruth exchanged

private marital vows in Florida in 1984, and Louisiana in 1999.[5]  (*Id*. 29, 35.)  The ALJ correctly concluded, however, that those utterances were inapt because neither Florida nor Louisiana recognized common law marriage at the time they were made.  (*Id.* 33.)

Florida ceased to recognize common law marriage on January 2, 1968, long before Ms. Da Costa and Mr. Ruth exchanged private marital vows there.  (*Id*. 9, citing POMS GN § 00304.075; *see* Fla. Stat. Ann. § 741.211 (expressly stating that Florida law does not recognize common law marriage).  Similarly, Louisiana did not recognize common law marriage in 1999 when Ms. Da Costa and Mr. Ruth went to New Orleans to renew their vows.  (R. 9, citing POMS GN § 00304.075); *see also Liberty Mutual Insurance Company v. Caesar*, 345 So. 2d 64, 65 (La. Ct. App. 1977) (acknowledging that "Louisiana law does not recognize 'common law marriage'").

Like in *Hartenstine*, where there was evidence of an exchange of "words of present intent" to be married while sitting in a hotel room in Maryland, a state which did not recognize common law marriage, there is no evidence to suggest that Ms. Da Costa and Mr. Ruth exchanged private marital vows in Pennsylvania or in any other state recognizing common law marriage.  *See Hartenstine*, 2016 WL 3135788, at *1, 12. Accordingly, the ALJ's determination that Ms. Da Costa did not satisfy the express agreement requirement was both legally correct and supported by substantial evidence.

---

[5] Pennsylvania's Dead Man's Act generally does not permit a spouse to testify about creation of a common law marriage if the other spouse is deceased.  42 Pa. Stat. and Cons. Stat. Ann. § 5930.  Such testimony is permissible, however, if the statements do not conflict with the interests of the decedent's estate.  *Id.*  Ms. Da Costa's testimony likely falls within that exception as exemplified by Smedley and Scott's efforts to support Ms. Da Costa's claim.  (R. 185-86.)  The Court, however, makes no finding in that regard.

11

**B.    Substantial Evidence Supports The ALJ's Finding of No Broad and General Reputation of Marriage**

The second prong of the Pennsylvania common law marriage test requires evidence of both "continuous cohabitation, and a general and broad reputation of marriage." *In re Wagner's Estate*, 159 A.2d at 497.  ALJ Suarez correctly concluded that Ms. Da Costa satisfied the continuous cohabitation requirement.  (R. 10.)  The Commissioner does not argue otherwise.  Ms. Da Costa and Mr. Ruth continuously lived together in Florida and New York from 1984 to 2005, except for 1993 to 1996 when they lived apart.  (*Id*. 39.)  The three-year break is immaterial as Ms. Da Costa and Mr. Ruth lived together continuously from 1996 until Mr. Ruth's death in 2005.

Nonetheless, Ms. Da Costa can only satisfy the second prong if the evidence shows that she not only continuously cohabited with Mr. Ruth, but also that she and Mr. Ruth had a general and broad reputation of marriage.  ALJ Suarez concluded the record did not support such a finding.  (*Id*. 10.)  To be sure, the record contains some evidence indicative of Ms. Da Costa and Mr. Ruth's reputation for marriage in Pennsylvania.  In a letter to the SSA, Mr. Ruth's brother, Scott, states that he believed "David and Irene were more 'married' than most couples that have the license .…"  (*Id.* 185.)  Both Scott and Smedley referred to Ms. Da Costa as Mr. Ruth's wife, and Mr. Ruth's nieces and nephews called her "Aunt Irene."  (*Id*. 36-37, 185, 202.)  While visiting Pennsylvania, according to Smedley, Ms. Da Costa was introduced to neighbors and shopkeepers as Mr. Ruth's "wife" and Smedley's "daughter in law."  (*Id*. 202.)  And, Ms. Da Costa says, they introduced themselves as a "married couple" at church and social events.  (*Id*. 111.)  Beyond the correspondence from Ms. Da Costa's two immediate family members, the record does not include any letters or evidence from third parties supporting a broad and

general reputation for marriage.  Nor does it include any non-legal/financial documents referring to Ms. Da Costa as Mr. Ruth's wife or holding out the couple as married.

As for legal and financial arrangements, Ms. Da Costa and Mr. Ruth maintained separate bank accounts, health insurance, and filed separate individual tax returns.  (*Id.* 28, 31.)  Ms. Da Costa and Mr. Ruth jointly owned a car and corresponding insurance policy, but the Record does not indicate whether Ms. Da Costa was identified as Mr. Ruth's wife on any car title or insurance documents.  Similarly, while Ms. Da Costa was "on [Mr. Ruth's] life insurance policy" (*id*. 30), no evidence of record suggests that the life insurance policy identified Ms. Da Costa as Mr. Ruth's wife.

ALJ Suarez found that Ms. Da Costa and Mr. Ruth's reputation of marriage was "more partial or divided," not broad and general, principally because Ms. Da Costa and Mr. Ruth did not represent their status as being husband and wife on financial and legal documents, despite being introduced as married "to social acquaintances during their sojourns to Pennsylvania." (*Id*. 10.)  The ALJ distinguished Ms. Da Costa's case from the facts in *Renshaw*, where the Second Circuit found a common law marriage existed under Pennsylvania law.  (*Id.*)  In *Renshaw,* the court found the reputation requirement was satisfied where the couple held themselves out to be married to everyone they interacted with during eight trips through Pennsylvania; the couple filed joint tax returns; and the wife adopted the same last name as the husband, wore a wedding band, and was listed as the husband's life insurance policy beneficiary.  *Renshaw,* 787 F.2d at 51-52.  By contrast, as the ALJ noted, Ms. Da Costa and Mr. Ruth continued to file separate tax returns and maintain their own bank accounts and medical insurance until their ceremonial marriage in New York on March 22, 2005.  (R. 10.)  And, there is no indication that Ms. Da Costa

adopted the Ruth name as her own, or that either she or Mr. Ruth wore a wedding band. Nor did they consistently refer to themselves as "husband and wife."[6]  For instance, Mr. Ruth referred to Ms. Da Costa only as his "fiancée" on legal documents in 2002.  (*Id.* at 30, 195.)

Courts have found a lack of evidence to support a "broad and general" reputation of marriage in similar circumstances.  *See, e.g., Cherry v. Secretary of Human Health Services*, No. CIV-88-1226A, 1990 WL 357197, at *1, 2 (N.D.N.Y. Apr. 17, 1990) (finding that a couple did not satisfy the requirements for a common law marriage, despite cohabitating for 22 years, being primary life insurance beneficiaries, acting as husband and wife in Pennsylvania, and exchanging private marital vows because their reputation of marriage was not "broad and general" due to filing separate tax returns, not jointly owning property, the wife not wearing a wedding ring, and not changing her last name); *Sturgill*, 2021 WL 5909207, at *8 (finding no "general reputation of marriage" due to marital status being listed as "fiancée"; joint car insurance with marital status of each individual in the couple listed as "single"; and family members providing affidavits that they believed the couple was "'practically married'").

Ms. Da Costa argues that she and Mr. Ruth did not file joint legal documents or acknowledge their being married on tax returns and the like because they were not aware they could do so legally.  (R. 28, 30.)  She asserts she was not aware that they enjoyed

---

[6] To be clear, neither adopting a spouse's last name, wearing a wedding band, nor any other specific fact is necessary or dispositive to the "broad and general reputation" determination.  Plenty of spouses do not share the same last name or wear wedding bands.  Those facts nonetheless are relevant considerations as the case law establishes, and their absence here is just some of what distinguishes the instant case from one like *Renshaw*.

legal status based on common law marriage in Pennsylvania or New York, and so she should not be penalized for lacking the "chutzpah" and "gumption" of the parties in *Renshaw* to report herself as married on legal documents. (Pl. Mem. at 23.[7]) The Court does not agree. Regardless of what Ms. Da Costa and Mr. Ruth knew or did not know about the law, they purposefully did not hold themselves out as married on legal and financial documents and did not consider themselves married in the "eyes of the law," whether common or otherwise.

In short, despite containing substantial evidence that Ms. Da Costa and Mr. Ruth sometimes presented themselves as married, and that family considered them husband and wife, there is sufficient evidence for the ALJ to have concluded that they did not enjoy a "broad and general" reputation of marriage, but rather only one that was "partial and divided." The Court cannot conclude that "a reasonable factfinder would have to conclude otherwise." *Brault*, 683 F.3d at 448. Although this Court might well reach a different result on de novo review of the factual record, the Court must uphold the ALJ's determination because it is supported by substantial evidence. *Jones*, 949 F.2d at 59 (stating that the court "'may not substitute its own judgment for that of the [Commissioner], even if it might justifiably have reached a different result upon a de novo review'") (internal quotation marks and citation omitted).

**Conclusion**

For the foregoing reasons, Plaintiff's motion seeking reversal of the final administrative decision denying her claim for widow's benefits is DENIED. To the extent

---

[7] Pl. Mem." refers to Memorandum of Law In Support of Plaintiff's Brief Pursuant To Section 6 of the Supplemental Rules For Social Security Actions Under 42 U.S.C. § 405 at Dkt. 19.

not discussed herein, the Court has considered all of Plaintiff's arguments and determined

them to be moot or without merit.

SO ORDERED,

_____

ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated: July 16, 2024
       New York, New York

Copies transmitted to all counsel of record.

16